## CAMPBELL *v.* GATES.

A. agreed to dig a certain quantity of iron ore annually, to clean it properly of all clay, sand, stones, &c., and deliver it to B., who agreed to furnish all tools, screens, ropes, and other implements necessary to work the banks. *Held,* that A. was only bound so far to cleanse the ore as could be done with the implements furnished by B., by using the same degree of skill and diligence as are ordinarily employed by persons in that business.

After A. had (according to the verdict) performed his contract in part, B. wrote him, alleging that the ore was not properly cleansed, and refusing to receive any more ore, unless he would agree to allow B. to make the ore good "by docking" what had been received, and what would thereafter be delivered. Ore was then tendered, and refused, unless this was agreed to. The contract is thereby terminated as to A. at his election, and he may sue for the refusal to perform.

A letter, refusing to comply with the contract unless on conditions, was sent by defendants to plaintiff on the 18th August. On the 25th, the plaintiff tendered the goods in performance, and the defendants' agent, under instructions, refused to accept them, unless prepared according to the contract. *Held,* that the judge was right in instructing the jury that the communications on which defendants intended plaintiff should act were contained in the letter, rather than in the conversation between their agent and the plaintiff..

The contract is indivisible, and but one action can be brought for damages for refusing to perform.

In error from the Common Pleas of Centre.

By a written contract, the plaintiff agreed to raise, out of his own land, 600 or 1,000 tons of iron ore annually, until five years from the following 1st of April, "to clean it properly of all clay, sand, stones, &c.," and deliver it for the use of the defendants' furnace. The defendants agreed to pay 25 cents a ton on all ore raised for their use (as ore leave), $1 a ton for all ore raised, and $2 per ton for hauling. They further agreed to provide all tools, screens, ropes, and other implements necessary to work the bank or banks, and also keep them in repair.

The present action was assumpsit, to recover damages for a breach of this agreement, by reason of the defendants' refusal to receive the ore tendered, and also to recover the value of the ore delivered and received. These were included in one count.

On the trial, it was shown that plaintiff had delivered ore to the defendants, under the contract, until Aug. 18th, 1846. On that day, defendants wrote to plaintiff the following letter:—

"I do not wish to be thought captious in anything I do in relation to my business. When I contracted with you for your ore, you were delivering at the furnace good rock ore, that was worth the price I agreed to pay you, and the ore we was to get was to be

as good and productive ore as that was. All the ore we have received, since the 1st of April last, is of an inferior sort, mostly screening of a very poor quality; at least the one-fourth of it is clay and soap-stone; there is scarcely one piece of the whole that is not mixed, more or less, with this yellow ocherish stone, like soap-stone, which renders it very unproductive; so much so, that it takes from three to four tons of your ore to make a ton of pig metal. We have frequently screened loads of your ore, and never found one of them that there was less than four and six large barrows full of dirt in, besides the soap-stone, which was not taken out and separated from the ore. I consider that you have violated our agreement by not cleaning the ore from clay and other foreign matter, which you promised in the agreement to do; and I hereby notify you, that hereafter I will not receive any more of your ore on any other terms than such as I conceive fair and just, and which I know of no other way of arriving at than to dock it to make it good. There is at least a half ton weight in every load of your ore, that is not ore, nor anything like ore, besides a great deal of matter that is nothing more than a miserable mixture of ore and other matter. I can abide the contract in no other way than by making your ore good by taking off all other matter from it in the process of docking, which I will endeavour to do as nearly right as possible; and if you think that you can stand the process of dockage of the ore you have hauled since the 1st of April, as well as that which you may haul hereafter, you may continue to haul; but I am determined to pay hereafter for nothing but the pure iron ore, either hauling, raising, or leave, and wish you to govern yourself accordingly; and if you cannot comply with your contract, and clean your ore from sand, clay, flint, stone, and other foreign matter, as you have engaged to do, then I want none of it, only for what it is worth, of which I myself am the best judge."

After this letter was received, the plaintiff hauled one load of ore to the furnace, but the agent refused to permit him to deliver it. A witness for the plaintiff said, that the agent assigned no other reason for his conduct, than the instructions of the defendants. The agent himself testified, that he had instructions from the defendants not to weigh any more ore for plaintiff, unless he agreed to clean it, according to his contract; that he told him so when the ore was tendered and refused. He further said, that one of the defendants gave him "the instructions on the 18th of August. He showed me the letter."

WOODWARD, P. J., instructed the jury, that contracts are to

receive such reasonable construction as will accomplish the intention of the parties, and the whole is to be read together; "that as the defendants were bound to furnish such 'tools, screens, ropes, and other implements' as should be necessary to work the bank with; so that, in promising properly to clean the ore of all clay, sand, stone, &c., the plaintiff promised to make diligent and skilful use of the 'tools, screens, ropes, and other implements,' which should be furnished him by the defendants; and was bound to use the same degree of diligence and skill which men engaged in similar business ordinarily employ. To clean the ore 'properly,' was to clean it as completely as usual diligence and skill, employing such implements as defendants had furnished, could do. The ore might, or might not, be absolutely clean of clay, sand, stone, and other impurities. If the defendants furnished implements which, with diligent and skilful use, would enable the plaintiff to extract from the bank what Mr. Campbell's letter called for, 'the pure iron ore,' the plaintiff was bound by the tenor of his contract to furnish it; but if they did not, they had no right to exact from the plaintiff the pure iron ore. It is said, that iron ore is never expected to go to the furnace absolutely pure, and it is not probable that these parties contemplated any departure from the customary practice. *Properly* cleansed, may mean fitted for making iron—reduced to the pure ore—or, it may mean, cleaned as iron ore is usually cleaned, before it is hauled to the furnace; but in this contract, this expression must be interpreted with reference to the facilities which the defendants bound themselves to furnish, and implies that degree of cleansing which reasonable skill and diligence, combined with these facilities, were capable of producing. Now, the question is for the jury, whether the plaintiff used such skill and diligence. If all the evidence satisfies them that he did; that he prepared the ore as well as he reasonably could with such means as were furnished him, we must, for the purposes of this action, consider the ore 'properly cleaned of all clay, sand, stone, &c.,' and hold the plaintiff to have performed his agreement in the particular in which alone failure has been imputed to him by the defendants.

"If the jury should be with the plaintiff in this point, the next question is, does defendant's letter of the 18th amount to an interruption and rescision on his part of the contract. The conduct of the clerk, in refusing to weigh the last load of the ore, was in pursuance of one of the defendant's instructions, and this letter having been read to the clerk, and then sent to the plaintiff, we are to presume that the communications on which they intended the plain-

tiff to act, are contained in the letter, rather than in the conversation which Gifford had with him. The letter, like the contract, is for the court to construe, and, taking it as a whole, without laying undue emphasis on any particular expression or sentence, we have no hesitation in pronouncing it a refusal further to execute the contract of 1st November, 1845—a repudiation of that agreement— and a proposition to substitute for it new and inconsistent conditions. The contract specifies the terms on which defendants were to receive and pay for the plaintiff's ore; the letter informs him that 'hereafter I will not receive any more of your ore on any other terms than such as I conceive fair and just;' the contract gives the defendants no right of dockage; the letter tells the plaintiff, plainly, that they have assumed this right, 'and if you think that you can stand the process of dockage of the ore you have hauled since the 1st of April, as well as that which you may haul hereafter, you may continue to haul.' The contract contemplated the delivery of ore *properly cleaned*, which, as we have already seen, might, or might not, be absolutely clean ore; the letter demands 'nothing but the pure iron ore.'

"Now, when it is considered that Gates had received no intimation that his ore was not according to the contract, and when the letter was followed by an authorized refusal to weigh the only load he carried to the furnace after the receipt of the letter, we hold that he was right in regarding a letter couched in such terms as an interruption of the contract, and a refusal on the part of the defendants to go on with its performance. He did so regard it. He carried no more ore, but instituted this action for damages."

His honour further said, that the declaration seemed to be comprehensive enough to embrace the facts of the case, and sustain a verdict for damages, and that the plaintiff might recover for the value of his contract for the whole time it had to run. The errors assigned were: In charging that the *narr.* was comprehensive enough, &c. 2. In the construction of the contract, as to the manner the ore was to be cleaned. 3. In saying that the jury were to presume that the conversation between the agent and plaintiff referred rather to the letter of defendants than to the conversation. 4. In saying that the letter of August 18th was an interruption of the contract, &c. 5. And in saying that damages might be recovered for the whole time the contract had to run.

*Curtin* and *Hale*, for plaintiffs in error—On the first point, cited 3 W. C. C. 381, 1 Harr. 450. 2. The contract was to clean the

ore before delivery. This was not complied with, by cleaning it as well as he could, with ordinary care and diligence. It was an absolute agreement, and he must show performance. Yet, under the charge, if it was done as well as he could with ordinary care, or as well as was usual, he had satisfied the contract. 3. There was conflicting testimony as to the reasons assigned by the agent for not receiving the ore, and yet the judge, as matter of law, directs the jury to assume that he was referring to the letter to plaintiff, rather than his verbal instructions, when he did so refuse. It was a question of fact: 4 R. 357; 3 Penna. 372. 4. The letter was not a rescision, it was but a requisition for exact performance; and besides, after the date of the letter there was parol evidence, by the agent, of a different sort of notice, subsequently given. This was for the jury: 12 Verm. 625. The tender of the load after the date of that letter waived his right to abide by it, as a rescision, and he must rest on the reasons then assigned by the agent for refusing to receive the ore: 7 Greenl. 70; 6 Taunt. 154–5. Damages incurred when suit was brought only could be recovered, not future damages: 6 Pick. 206.

*McAllister* and *Burnside*, contrà.—The agent evidently referred to the reading of the letter to him, as the instructions which he had received, and under which he acted. Besides, he mentions no other instructions than such as were thus given. It is therefore reasonable to infer, as the court told the jury, that the plaintiff was intended to act on the written communication rather than on loose verbal communications, which would be received at second hand. After the date of the letter, no further instructions were given to the agent; and if, therefore, he meant to put the refusal on other grounds, he acted without authority. That this letter was a refusal to comply with the contract, on the terms as construed by the court below, is plain; and, the contract being indivisible, but one cause of action accrued for all damages that could possibly arise out of the breach: 3 W. & S. 143; 6 S. & R. 375; 1 Den. 317, 602, 606.

*June* 4. COULTER, J.—There is a lucid charge in this cause from the court below, to the jury, covering all the questions of law discussed here; and, as the reasons therein set forth are in accordance with the views which this court entertain on the subjects discussed, the judgment is affirmed, for the reasons stated by the learned judge.

Judgment affirmed.