J-E01002-25

| TEDESCO EXCAVATING & PAVING, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| FWH DEVELOPMENT, LLC | : | |
| Appellant | : | No. 995 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 1, 2022
In the Court of Common Pleas of Allegheny County
Civil Division at No(s):  GD 19-006017

BEFORE:  LAZARUS, P.J., BOWES, J., PANELLA, P.J.E., DUBOW, J., McLAUGHLIN, J., KING, J., SULLIVAN, J., BECK, J., and LANE, J.

OPINION BY PANELLA, P.J.E.:                    **FILED: March 27, 2026**

FWH Development, LLC, appeals from the $678,238.31 judgment imposed against it, after a jury verdict in favor of Tedesco Excavating & Paving, Inc. After our thorough review, we affirm because Tedesco sufficiently performed the contract to avail itself of the Contractor and Subcontractor Payment Act ("CASPA"),[1] which protected Tedesco from FWH's anticipatory repudiation.

FWH hired Jerrod Crosby of David E. Wooster & Associates to serve as the Project engineer for Whitehall Meadows, a residential and commercial development along State Route 228 in Butler County that FWH intended to build. Work on Route 228 involved widening the road and adding traffic lights, which Mr. Crosby placed out for bids.

---

[1] *See* 73 P.S. §§ 501-517.

Tedesco was the lowest bidder. On Mr. Crosby's recommendation, FWH's owner, Fred Hespenheide, signed a unit-price contract with Tedesco on May 19, 2015, to perform the Route 228 work, at a contract price of $1,259,000.00. **See** Plaintiff's Ex. 53, Agreement § 2 at 2, 6.

The contract included Article 15, "Suspension of Work and Termination." **Id.** Agreement § 4 at 32-34. Under Article 15.4, FWH could terminate the contract "without cause" after providing Tedesco and Mr. Crosby seven days' written notice. **Id.** at 33. If FWH invoked the provision, it agreed to pay Tedesco "for completed and acceptable work executed in accordance with the contract . . . including fair and reasonable sums for overhead and profit on such work." **Id.** (some capitalization omitted). However, Tedesco could not collect "anticipated profits or revenues or other economic loss arising out of or resulting from such termination." **Id.**

The contract required the work to be completed in 220 days, and time was of the essence, with FWH requiring Tedesco to immediately complete various work items. **See id.**; N.T., 5/9/22, at 117-127. Toward that end, Tedesco executed a subcontract with an electrical subcontractor, procured and stored traffic light poles, prepared and submitted detailed engineering shop drawings for the traffic light poles, and secured insurance for the Project. **See** N.T., 5/9/22, at 119; Plaintiff's Ex. 68, Certificate of Liability Insurance; Plaintiff's Ex. 69, Tedesco & Bronder Technical Services Contract for 228 Project; Plaintiff's Ex. 70, Plaintiff's Ex. 71, Bronder Proposal to Install Traffic

Intersection. FWH required representatives from Tedesco and its electrical subcontractor to attend a pre-construction meeting with PennDOT on or about July 1, 2015. *See* N.T., 5/12/22, at 563-65; Plaintiff's Ex. 53, email confirming PennDOT meeting.

Although Tedesco planned to complete the Route 228 work in 2015, at the PennDOT meeting FWH informed Tedesco that it lacked funding and would need to secure another lender. *See id.* However, the Project was not suspended at that time, leaving Tedesco with a gap in its 2015 paving schedule and resulting in the loss of the 35% profit Tedesco expected to earn that summer on the Route 228 work. Tedesco remained eager and ready to do the work whenever FWH obtained financing. *See* N.T., 5/11/22, at 399; N.T., 5/12/22, at 582-83. Despite the parties communicating over the next three years, the Project did not commence.

In response to FWH's March 20, 2018 request for an escalation proposal for price increases from the original contract price, due to the rise in fuel, materials, and labor costs, Tedesco submitted a proposal to Mr. Crosby for an estimated 5% increase per year, bringing the contract price to $1,560,000.00. FWH did not start the Project in 2018. It hired Momentum, a Seattle-based company, to replace Wooster & Associates and Mr. Crosby as site manager. Momentum sent Bob Saunders to monitor the subcontractors and "the construction management on site and [to do] all of that work, labor bids, supervising bids." N.T., 5/12/22, at 538.

Mr. Saunders met with Tedesco to request an updated escalation proposal. On August 15, 2018, Tedesco e-mailed Mr. Saunders a new contract price of $1,652,463.70. Mr. Saunders did not reply.

On March 19, 2019, Mr. Saunders communicated to a third party that FWH "awarded the contract for site paving and the [Route 228] improvements" to Shields Paving, Tedesco's competitor. Plaintiff's Ex. 60 at 1. On April 4, 2019, FWH's counsel[2] wrote to Tedesco and Tedesco's subcontractor, admitting FWH did not intend to honor its contract with Tedesco. He stated:

> In 2015, it was intended that Tedesco [would] serve as the [Route 228] contractor for the Whitetail Meadows . . . Project in Adams Township, Butler County . . .
>
> . . . In late 2018, Tedesco submitted a revised estimate for the cost of the [Route 228] work. Tedesco's revised cost estimate was substantially in excess of the original cost estimate provided by Tedesco in 2015. Tedesco's revised cost estimate was also in excess of other cost estimates for the [Route 228] work FWH received from other contractors. As a result, [FWH will] no longer use Tedesco to complete the [Route 228] work for the Project.

Plaintiff's Ex. 61, at 2.

On April 23, 2019, three weeks later, Tedesco sued FWH for breach of contract, seeking an anticipated 35% overhead and lost profits from the Route 228 work. On the same date, Tedesco issued Payment Application #2 for Final Payment to FWH, also requesting payment for Tedesco's overhead and profit

---

[2] FWH's counsel has passed away. Therefore, he did not testify at trial.

margin due under the Agreement as a result of FWH's breach of contract, (*i.e.*, 35% of the original value of the Agreement, less payments made). **See** N.T., 5/10/22, at 234-35; Plaintiff's Ex. 4, Payment Application #2 for Final Payment. FWH never responded to Payment Application #2. **See** N.T., 5/10/22, at 235.

On May 3, 2019, FWH sent Tedesco a letter, stating: "Pursuant to Section 15.4 of the General Conditions of the [May 19, 2015] agreement, [FWH] hereby provides the requisite seven days' notice of its intention to terminate the agreement for convenience. Said termination will be effective May 10, 2019." Defendant's Ex. 4 (some capitalization omitted).

The case proceeded to a jury trial, at the conclusion of which the jurors found FWH to be in breach of the 2015 contract. It awarded Tedesco $401,046.00 in overhead and lost profits. FWH moved for post-trial relief, and Tedesco moved to mold the verdict to include interest and attorneys' fees under CASPA. The trial court denied FWH's motion and partially granted Tedesco's motion. It added $135,664.87 in interest; $133,682.00 in attorneys' fees; and $7,845.44 in legal costs to the verdict. The trial court entered judgment in favor of Tedesco for $678,238.31.

FWH appealed, raising nine issues for this Court's review. A divided three-member panel affirmed the judgment, disagreeing over whether the trial court erred in awarding an additional $269,346.87 in statutory damages under CASPA. The *en banc* Court granted reargument. FWH raises one

question for our review: "Whether a contractor that has been paid for all work performed under a construction contract is entitled to recover interest and attorneys' fees under the [CASPA]?" FWH's Substituted Brief, at 4.[3]

"The interpretation and application of a statute is a question of law." *In the Interest of C.K.M.*, 279 A.3d 610, 611 (Pa. Super. 2022), *appeal denied*, 291 A.3d 864 (Pa. 2023) (citation omitted). "As with all questions of law, we must employ a *de novo* standard of review and a plenary scope of review[.]" *Id.* at 612 (citation omitted).

Our "goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly while construing the statute in a manner that gives effect to all its provisions." *Id.* (citing 1 Pa.C.S.A. § 1921(a)). "It is well settled that the best indication of the General Assembly's intent may be found in a statute's plain language." *Id.* (citation omitted). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). Importantly, in undertaking statutory analysis, "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include." *Shafer Elec. & Condy. v. Mantia*, 96 A.3d 989, 994 (Pa. 2014) (citation omitted).

---

[3] FWH does not contest the panel's affirmance of the trial court judgment finding FWH materially breached the Agreement and awarding Tedesco's principal damages from the breach in the amount of $401,046.00. *See* FWH's Substitute Brief, at 6-7.

The CASPA is "a comprehensive statute enacted in 1994 to cure abuses within the building industry involving payments due from owners to contractors, contractors to subcontractors, and subcontractors to other subcontractors." ***Zimmerman v. Harrisburg Fudd I, L.P.***, 984 A.2d 497, 500 (Pa. Super. 2009). A remedial statute, its purpose is "to protect contractors and subcontractors and to encourage fair dealing among parties to a construction contract." ***Id.*** at 500–01 (ellipsis, brackets, citation, and internal quotation marks omitted). When the CASPA applies, "interest, penalty, attorney fees, and litigation expenses may be imposed on an owner . . . who fails to make payment to a contractor . . . in compliance with the statute." ***Id.*** at 501 (footnote omitted).

Under the CASPA, "[p]erformance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle [them] to payment from the party with whom the contractor or subcontractor has contracted." 73 P.S. § 504. FWH claims that this sentence requires performed and completed physical work as a prerequisite for a contractor or subcontractor to recover anything under the CASPA. ***See*** FWH's Substituted Brief, at 11-14. According to FWH, Tedesco's breach-of-contract action does not fall under the "CASPA's remedial umbrella," because contractors and subcontractors may only seek statutory interest and attorneys' fees for "field work" that was "actually performed" and "satisfactorily completed." ***Id.*** at 11. We disagree.

FWH's interpretation assumes that, when the legislature wrote "Performance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle [them] to payment," 73 P.S. § 504, what the legislature really meant to write was, "Performance [**of physical work and completion of the construction project**] by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle [them] to payment." *Id.* However, the General Assembly did not include those words in Section 504.

Nothing in the statutory language supports an assumption that only work carried out to completion constitutes "performance" and is the sole prerequisite to invoke the CASPA. In fact, the CASPA does not define "performance." Therefore, this Court must consider, decide upon, and enforce the definition of "performance" that the legislature most likely intended to use in Section 504. This task is particularly difficult, because there are many definitions for "performance."

For example, the Oxford English Dictionary contains 13 definitions of "performance." *See* THE OXFORD ENGLISH DICTINARY, *The Meaning & Use of "Performance."*[4] Admittedly, over half of those are inapplicable to the CASPA —e.g. plays, concerts, poetry, medicine, business investments, and religious

---

[4] Available at:
https://www.oed.com/dictionary/performance_n?tab=meaning_and_use#31240456 (last visited 9/22/25).

ceremonies. Still, if the legislature intended "performance" by its common, everyday meaning, any of the following could apply in Section 504:

> 1.a.  The accomplishment or carrying out of something commanded or undertaken; the doing of an action or operation.
>
> 1.b.  The quality of execution of an action, operation, or process; the competence or effectiveness of a person or thing in performing an action; **spec.** the capabilities, productivity, or success of a machine, product, or person when measured against a standard.
>
> 1.c.  Something performed or done; an action, act, deed, or operation; (occasionally) a notable deed, achievement, or exploit (**obsolete**).
>
>        *     *     *
>
> 3.  The carrying out, discharge, or fulfilment of a command, duty, promise, purpose, responsibility, etc.; execution, discharge.  Frequently opposed to **promise**.
>
>        *     *     *
>
> 4.d.  . . . a difficult, time-consuming, or annoying action or procedure.

**Id.** (citations and etymological timelines omitted; emphasis in original).

In addition to the five colloquial definitions, "performance" carries with it a host of legal meanings. The entry for "performance" in Black's Law Dictionary takes up nearly half a page, with over 20 definitions from which to choose.

The pertinent definitions of "performance" are as follows:

> **1.**  The successful completion of a contractual duty, usu. resulting in the performer's release from any past or future

liability; EXECUTION (2). — Also termed ***full performance***. Cf. nonperformance; misperformance.

> **alternative performance** (1875) One of two agreed-on performances, either of which will satisfy a contractual obligation.

> **defective performance** (1832) A performance that, whether partial or full, does not wholly comply with the contract. One example is late performance.

> **exact performance** (17c) Full performance of an obligation as detailed in the contract.

> **future performance** (17c) Performance in the future of an obligation that will become due under a contract.

> **misperformance** *See* MISPERFORMANCE.

> **negligent performance** (1818) Performance in which the actor fails to exercise reasonable care.

> **nonperformance** *See* NONPERFORMANCE.

> **part performance** (18c).

**1.** The accomplishment of some but not all of one's contractual obligations . . . **3.** PART-PERFORMANCE DOCTRINE . . .

> **substantial performance** (18c) Performance of the primary, necessary terms of an agreement. ***See*** SUBSTANTIAL-PERFORMANCE DOCTRINE.

BLACK'S LAW DICTIONARY, at 1319 (10th ed. 2014) (emphasis in original).

Given this extensive list of potential definitions for "performance" that could apply to 73 P.S. § 504, FWH's claim that Section 504 contains plain and unambiguous language is untenable. Instead, the General Assembly's failure to define "performance" within the CASPA leaves this Court in a definitional quagmire.

For example, the first definition of "performance" in Black's Law Dictionary, "successful completion of a contractual duty . . . [a]lso termed full performance," seems to be the one that FWH prefers. *Id.* Arguably, the legislature could have used "performance" in Section 504 to mean only this narrow definition that FWH believes to be correct. However, FWH does not explain why this Court should adopt that definition on the legislature's behalf.

Neither does FWH explain why the General Assembly did not intend another possible definition provided by Black's Law Dictionary, the "accomplishment of some but not all of [Tedesco's] contractual obligations," to constitute "performance" under Section 504. *Id.* If that definition is the one that the legislature intended, then Tedesco did perform the contract by "entering an electrical subcontract, providing various submittals and shop drawings, securing insurance for the Project, attending a pre-construction meeting with PennDOT, and blocking off its schedule to meet the Project's schedule needs." Tedesco's Brief, at 41.

Either definition could reasonably have been the one that the legislature intended. Critically, those definitions are contradictory, especially as applied in this case. Hence, reasonable minds may differ as to which definition of "performance" the General Assembly intended to use in Section 504. In light of this latent ambiguity in the language, FWH's suggestion that 73 P.S. § 504 is clear and unambiguous is erroneous.

Because the language of Section 504 is unclear and ambiguous, this Court must turn to the other provisions of Statutory Construction Act, in which

the legislature commands that its statutes "shall be liberally construed to effect their objects and to promote justice." 1 Pa.C.S.A. § 1928(c). "Moreover, because CASPA is a remedial statute, we must accord it a liberal construction." **_Zimmerman_**, 984 A.2d at 502 n.8 (citations omitted). The CASPA's aim is to protect contractors and subcontractors, such as Tedesco, from materially breaching parties, such as FWH. **_See id._** at 500-01. Hence, in resolving the definitional ambiguity in the word "performance," the Statutory Construction Act directs this Court to apply the definition of "performance" most favorable to Tedesco. Accordingly, we conclude that the definition of "performance" that the legislature most likely intended in Section 504 is the "accomplishment of some but not all of one's contractual obligations[.]" BLACK'S LAW DICTIONARY, at 1319.

Based on that definition, by fulfilling some its contractual obligations—meeting and contracting with subcontractors, submitting documents and shop drawings to FWH's Project Manager, buying insurance, meeting with PennDOT about the Project, and keeping a gap open in its paving schedule for FWH—Tedesco was performing the contract. Nothing in the statute or the appropriate, remedial definition from BLACK'S LAW DICTIONARY requires the completion of all physical work to constitute "performance," as FWH insists.

Moreover, even if the definition of "performance" in Section 504 meant "full performance," (and it does not) FWH's anticipatory repudiation of the contract terminated all Tedesco's contractual obligations, as a matter of contract law.

- 12 -

An "anticipatory repudiation or breach" may occur when one party expresses "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." ***Harrison v. Cabot Oil & Gas Corp.***, 110 A.3d 178, 184 (Pa. 2015).

When FWH materially breached the contract by hiring Shields Paving to do the work that FWH promised to Tedesco, whatever work Tedesco previously performed under the contract instantly became "full performance," because Tedesco had no further contractual obligations to FWH under the contract that FWH materially breached. ***See*** BLACK'S LAW DICTIONARY, at 1319; ***see also Hocking v. Hamilton***, 27 A. 836, 838 (Pa. 1893) ("Where one party to an executory contract prevents the performance of it, or puts it out of his own power to perform it, the other party may regard it as terminated, and demand whatever damage he has sustained thereby.").[5]

When the General Assembly enacted the CASPA in 1994, it was well aware of Pennsylvania's common law of contracts, including the doctrine of

---

[5] It should be noted that, under FWH's interpretation of the CASPA, a contractor could be hired to pave 100 miles of highway, and, after paving 99 miles, if the hiring party repudiates the contract and prevents the contractor from paving the final mile, then the contractor would not have completed the construction contract. In FWH's interpretation, this would bar the contractor from seeking interest and attorneys' fees on its expected profits from the project under the Act. Surely, the General Assembly did not intend this unreasonable result by its use of the word, "performance," in 73 P.S. § 504. ***See In re Estate of Ruhlman***, 291 A.3d 916, 921 (Pa. Super. 2023) ("[W]hen interpreting a statute, we must presume that the Legislature did not intend to produce an absurd or unreasonable result.") (internal citations and quotation marks omitted).

anticipatory repudiation. That doctrine has existed in this Commonwealth for at least 175 years.

By way of example, in **Campbell v. Gates**, 10 Pa. 483 (1849), on November 1, 1845, the parties entered into a five-year contract that Gates would mine, properly clean, and haul iron ore to Campbell's furnace. Gates began delivering the ore, but Campbell sent him a letter complaining that the ore was "of an inferior sort . . . which renders it very unproductive" in the furnace. **Id.** at 484. Gates immediately sued Campbell for materially breaching the entire contract.

The trial court charged the jury that, as a matter of law, the letter was an anticipatory repudiation and material breach. The court said:

> we have no hesitation in pronouncing [the letter] a refusal [by Campbell to perform] the contract of 1st November, 1845 – a repudiation of that agreement – and a proposition to substitute for it new and inconsistent conditions. The contract specifies the terms on which [Campbell was] to receive and pay for [Gates'] ore; the letter informs [Gates] that "hereafter I will not receive any more of your ore on any other terms than such as I conceive fair and just." [But] the contract gives [Campbell] no right of dockage; the letter tells [Gates], plainly, that [Campbell has] assumed this right, "and if you think that you can stand the process of dockage of the ore you have hauled since the 1st of April, as well as that which you may haul hereafter, you may continue to haul." The contract contemplated the delivery of ore **properly cleaned**, which . . . might, or might not, be absolutely clean ore; [by contrast,] the letter demands "nothing but the pure iron ore."
>
> Now, when it is considered that Gates had received no intimation that his ore was not according to the contract, and when the letter was followed by an authorized refusal to weigh the only load he carried to the furnace after the

> receipt of the letter, we hold that he was right in regarding a letter couched in such terms as an interruption of the contract, and a refusal on the part of [Campbell] to go on with its performance. [Gates] did so regard it. He carried no more ore, but instituted this action for damages.

*Id.* at 486 (emphasis in original).

The trial court also held that the anticipatory repudiation "seemed to be comprehensive[.]" *Id.* In other words, Gates could treat the repudiation as if it were an immediate, material breach. Thus, Gates was entitled to "recover for the value of his contract for the whole time it had [left] to run." *Id.*

The jury awarded Gates his lost profits for the five-year life of the contract. Campbell appealed and contended the letter was not an anticipatory repudiation, as a matter of law, but only "a requisition for exact performance[.]" *Id.* at 487. He also contended that Gates could only recover losses sustained from work he actually performed, not future lost profits.

Summarily rejecting Campbell's claims of error, the Supreme Court of Pennsylvania held that the jury charge "accord[ed] with the views which this Court entertains on the subjects discussed" and affirmed "for the reasons stated by the learned judge." *Id.* at 487. Thus, the Supreme Court adopted the trial court's anticipatory-repudiation charge as Pennsylvania law.

With this history of the common law as background, if the legislature wished to exclude cases such as this one—where an owner anticipatorily repudiates a construction contract, and the contractor (or the subcontractor) treats the repudiation as a material breach—from the scope of the CASPA, it would have said so. The legislature did not offer any language excluding

- 15 -

anticipatory repudiations from the CASPA's protections, and we can think of no reason as to why it would not want to protect contractors and subcontractors from the increased economic harm that anticipatory repudiations cause.

As this case exemplifies, by stringing Tedesco along for four years, FWH forced Tedesco to leave gaps in its paving schedule that it could not fill. FWH's dishonesty about its readiness to begin the Project in 2015 deprived Tedesco of paving profits from this and other potential jobs until FWH ultimately repudiated the contract.

An owner who allows a contractor to perform the work in the time frame intended at the time of contracting but then refuses to pay the contractor for some or all of the completed work, at least allows the contractor to move its employees and equipment to other jobs and to continue earning an income elsewhere. But Tedesco will never be able to make up the lost time when its employees and equipment sat idle while waiting for FWH to greenlight the Project. Then, instead of making Tedesco whole by paying its lost overhead and anticipated profits when FWH anticipatorily repudiated the contract and Tedesco billed FWH for the losses FWH caused, FWH forced Tedesco to pursue this protracted ligation.

It is now over a decade since the parties first contracted and FWH began a pattern of obstructing Tedesco's performance. And still FWH has not paid a dime of contractual damage to Tedesco.

Instead, FWH forced Tedesco to eat into the lost overhead and anticipated lost profits by paying for attorneys' fees and costs to litigate this case. The CASPA's ordinary interest, penalty interest, and attorneys' fees are particularly appropriate here to offset the losses that FWH caused Tedesco from both this Project and other potential paving jobs that Tedesco could not schedule while it waited on FWH.

Otherwise, there is no law to discourage unscrupulous owners, such as FWH, from anticipatorily repudiating construction contracts and subsequently litigating the contractor (and particularly a small, solo contractor) to death. While an owner is entitled to its day in court as well, we see no reason why it should be allowed to repudiate a contract as flagrantly as FWH has and then not reimburse the contractor's attorneys' fees and interest under the CASPA after the owner loses before a jury. Using FWH's interpretation, when the costs of a contractor's lawyers and litigation exceed the contractor's anticipated profits from a repudiated contract, the contractor will be forced to accept the broken contract without recourse to the courts, because the contractor would lose more money vindicating its contractual rights than enforcing them. This is the harsh result that the General Assembly sought to remedy when it adopted the CASPA.

This situation is more egregious than when an owner allows a contractor to complete the contract and withholds payment. An owner who anticipatorily repudiates the contract completely deprives the contractor (or subcontractor) of its expectation interest, whereas a refusal to pay for work performed only

partially impacts that interest, and the contractor does not lose out on other potential jobs over the course of years.

Moreover, even if an owner rightly withholds payment for unsatisfactory work, the contractor is able to collect payment once the work is corrected. But a contractor who has suffered anticipatory repudiation would never be able to complete the work and invoke the CASPA's protections, if FWH's narrow reading of the law stands. FWH offers no rationale for drawing such an absurd distinction based only on when an owner materially breaches a construction contract, and this Court does not believe the legislature intended such an unfair result in drafting 73 P.S. § 504. "The General Assembly does not intend a result that is absurd . . . ." 1 Pa.C.S.A. § 1922(1).

Additionally, FWH relies on 73 P.S. § 506(a). **See** FWH's Substituted Brief, at 12-13, 20. That subsection provides, "The owner may withhold payment for deficiency items according to the terms of the construction contract. The owner shall pay the contractor according to the provisions of this act for any item which appears on the invoice and has been satisfactorily completed." 73 P.S. § 506(a). The legislature defined "deficiency item" as "***Work performed*** but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract."  73 P.S. § 502 (emphasis added).

Under Section 502, when the work is poorly performed, an owner may withhold payment until the work is properly completed. However, this Court

does not view an allowance for owners who suffer poor workmanship as a legislative endorsement of anticipatory repudiation by an owner.

Here, FWH prevented Tedesco from performing the contract, because it anticipatorily repudiated that contract. There were no "deficiency items," for which FWH could withhold payment under Section 506(a), because FWH's violation of contract law prevented Tedesco from performing. In this Court's view, in order for an owner to invoke Section 506(a) of CASPA, the owner must not have anticipatorily repudiated and, instead, must have permitted the contractor or subcontractor a meaningful opportunity to perform the work. Any result to the contrary would frustrate the remedial purposes of the CASPA. Thus, Section 506 does not shield FWH from statutory liability following its anticipatory repudiation.[6]

Indeed, as Tedesco contends, 73 P.S. § 505 imposes statutory duties upon owners, such as FWH. *See* Tedesco's Brief, at 22-28, 31-32, 35. "The owner shall pay the contractor strictly in accordance with terms of the construction contract." 73 P.S. § 505(a).

On April 23, 2019, Tedesco provided FWH Application for Payment #2 for Final Payment, which detailed the lost overhead and profits that Tedesco

---

[6] Similarly, we reject FWH's reliance on section 3934 of the Prompt Payment section in the Commonwealth Procurement Code, 63 Pa.C.S.A. §§ 3901-3939, which "applies to contracts entered into by a government agency" and serves to govern public contracts. 62 Pa.C.S.A. § 3901. The section on which FWH relies applies to "withhold[ing] payments for deficiency items according to the terms of the contract." 62 Pa.C.S.A. § 3934(a). Not only are there no claimed deficiency items here, we decline FWH's invitation to decide this issue based on the construction of a wholly inapplicable statute.

sought in the wake of FWH's anticipatory repudiation and material breach. Upon Tedesco's application for final payment, according to Article 5.2 of the contract, FWH "shall pay the remainder of the Contract Price . . . ." Plaintiff's Ex. 53, Agreement § 2 at 2, 3.

The parties agree that FWH did not pay Tedesco the amount listed in Application for Payment #2 for Final Payment. Therefore, FWH did not "pay [Tedesco] strictly in accordance with terms of the construction contract." 73 P.S. § 505(a). Under these circumstances, CASPA applies because (1) FWH anticipatorily repudiated the construction contract, (2) Tedesco demanded final payment for its lost overhead and profits, and (3) FWH refused to pay the demanded sum. Hence, the trial court correctly applied the CASPA's remedial provisions to this case.

Judgment affirmed.

President Judge Lazarus, Judges Dubow, McLaughlin, and Lane join the opinion.

Judge Bowes files a dissenting opinion, joined by Judges King and Beck. Judge Sullivan concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/27/2026